UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ABL, by his parents and legal guardians,
DL and AB, and DL, and AB,
individually,[1]

                                        Case No.

v.

Providence Public Schools


## COMPLAINT

## PRELIMINARY STATEMENT

1.      This is a complaint for judicial review of a final decision and hearing order rendered by

Impartial Hearing Officer (IHO) Federic Tobin pursuant to the Individuals with Disabilities

Education Act (IDEA), 20 U.S.C. § 1400, et seq. Plaintiffs are ABL, a minor student, and his

parents DL and AB.  Plaintiffs seek reversal of a hearing decision and order, dated September 20,

2022.  Plaintiffs seek an order requiring the Providence Public Schools (Providence Public

Schools, Providence Public School District,  or Providence)  to provide ABL with compensatory

education and to reimburse the parents for all expenses that they have incurred in connection with

the student's placement at the Wolf School and tutoring, among other things.

2.      This complaint also includes claims under Title II of the Americans with Disabilities Act,

42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,

for Providence's failure to provide reasonable accommodations and to provide equal opportunity

to Plaintiff ABL.

---

[1] The complaint refers to the plaintiffs as ABL, AB, and DL to maintain the student's
confidentiality as a minor pursuant to Fed. R. Civ. P. 5.2(a).

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 20 U.S.C. §1415(i)(2)(A), 20 U.S.C. § 1415(i)(3(A) and 28 U.S.C. §1331.

4.     Plaintiffs have exhausted their administrative remedies and are the aggrieved parties within the meaning of 20 U.S.C. §1415 (i)(2)(A).

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

### Parties

6.     At all times relevant to this Complaint, Plaintiffs resided in Providence, Rhode Island, which is in the Providence school district.

7.     At all times relevant to this action, Plaintiff ABL (YOB:2010) has resided and continues to reside in the Providence Public School District and is a child with disabilities within the meaning of the IDEA, 20 U.S.C. § 1401(3), and he has received special education services from Defendants. He was found eligible has having an other health impairment under 20 U.S.C. §1401(3)(A). At all times relevant to this action, ABL was eligible to receive special education and related services from Providence and Providence was required to provide him with a free appropriate public education (FAPE).

8.     Plaintiff DL is the father and legal guardian of ABL

9.     Plaintiff AB is the mother and legal guardian of ABL.  Together, DL and AB are referred to as "Parents."

10.    Defendant the Providence Public School District (Providence) is a local educational agency (LEA) within the meaning of 20 U.S.C. §1401(19) and is the agency responsible for providing ABL a free appropriate public education (FAPE).  Its principal place of business is located at 797 Westminster Street, Providence, RI  02903

**Statutory Scheme**

11.    The IDEA was adopted in 1975 to ensure that all children with qualifying disabilities receive a FAPE.

12.    One purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. §1400(d).

13.    Educational programs for children with disabilities are designed and implemented through an Individualized Education Program (IEP).  The contents of the IEP are required by statute. 20 U.S.C. §1414(d)(1)(A). A team of "qualified professionals and the parent of the child" must meet in an IDEA eligibility meeting to determine whether or not the child is eligible for special education and, if so, what the educational needs of the child might be. 20 U.S.C. §1414(b)(4).

14.    A student must be found eligible as a child with a disability under 20 U.S.C. § 1401(3) to be entitled to services under IDEA, 20 U.S.C.§ 1414 (a), (b) & (c).  Once a student has been found eligible, the IEP must be designed to meet "the child's needs that result from the child's disability to be involved in and make progress in the general education curriculum;" and "meet each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(ii) (aa) & (bb).

15.    The federal regulation specifically provides that FAPE must be available "to any child with a disability who needs special education and related services, even though the child has not failed or been retained in a course and is advancing from grade to grade." 34 C.F.R. § 300.101(c)(1).

16.    Whenever there is a disagreement between the parents and a school district regarding the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the

child, either party may present a complaint to be heard in an impartial administrative proceeding known as a "due process hearing," conducted by the state educational agency. 20 U.S.C.§§1415(b)(6) & (f)

17.     As required by the IDEA, the Rhode Island Department of Education established an impartial due process hearing procedure. 20 U.S.C. § 1415(f)(1)(A). In Rhode Island, the Impartial Hearing Officer's Decision is the final administrative decision.

18.     The IDEA provides that parties aggrieved by the decision in the administrative proceedings have the right to bring a civil action, and that the court shall receive the administrative record, hear additional evidence at the request of a party and base its decision on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C).

**Statement of Facts**

19.     ABL is twelve years old.  ABL is a bright, charming, engaging boy.  ABL has been a Providence resident his entire life, and he has an extensive record of receiving special education services from Providence Public Schools.

20.     Shortly after birth, there were early concerns about the posturing of ABL's left arm.  He began receiving Early Intervention Services at eight weeks of age.

21.     At age six months, ABL was diagnosed with in-utero stroke that resulted in developmental delays during infancy and a diagnosis of Left-Hemiplegic Cerebral Palsy. ABL's stroke likely happened between 28 to 38 weeks of gestation and impacted the frontal lobe as well as the parietal lob.  It impacted him more on the right side of the brain, which controls the left side of the body. He has limited use of his left arm and hand. His left hand is a helper hand, and he does not have the ability to distinguish his fingers on that hand.  He has an impaired gait.  ABL has a very unique disability because of the location and nature of his stroke.

22.    As a young child, ABL experienced developmental delays in speech, gross and fine motor control, and learning readiness skills. At age three, he transitioned from Early Intervention Services to an IEP administered by Providence.

23.    ABL attended pre-school at the Meeting Street Early Learning Center because Providence did not have a full-day pre-school and ABL was not potty-trained.

24.    Once he was potty-trained, he attended the Brown/Fox Point Early Childhood Education Center along with on-site speech therapy (ST) (half hour, once per week), occupational therapy (OT) (half hour, twice per week), and physical therapy (PT) (half hour, once per week).  The therapists were service providers from Providence.  His class included students with IEPs and students without IEPs.

25.    ABL underwent his first neuropsychological evaluation in February 2016 when he was five and a half years old and in his final year of preschool.  Rachel Baldwin, Ph.D., performed the evaluation at Parents' expense.

26.    Dr. Baldwin's initial diagnostic impression was Left Hemiplegia, with a recommendation that the current ST, OT, and PT be maintained and a school psychologist or other comparably credentialed behavioral specialist be added to the IEP team.  ABL demonstrated strong nonverbal reasoning skills and verbal and nonverbal intellectual skills. With regard to math, the report stated: "He is at particular risk for challenges with his academic development in mathematics. […] and faces significant challenges related to weaknesses in right-hemisphere functions and executive functioning."  There is no dispute that, because of ABL's in utero stroke, he was at significant risk for challenges with academic development in math, and that Providence was aware of that risk in 2016 as a result of Dr. Baldwin's report.

27.    As ABL approached the transition to elementary school, two IEP meetings were held to

discuss the appropriate placement for ABL. At the second meeting, the IEP team discussed the benefits of Henry Barnard School (HBS) for ABL. At that time, HBS was a laboratory school on the Rhode Island College (RIC) campus.[2]  It had a general education program with small class sizes, a low teacher-student ratio, and an individualized curriculum.  Providence could deliver ABL's special education services to him at HBS using Providence staff via an IEP.  At that time, ABL's parents were not offered an inclusion classroom in Providence that included both a general education teacher and a special educator.  Based on the IEP meetings, ABL's parents had the understanding that the IEP team had recommended HBS as preferable to a large general education class for ABL. They therefore enrolled him at HBS, with Parents paying for the school's tuition and Providence providing special education services via an IEP.

28.    An inclusion classroom has students with IEPs in a general education classroom along with students who do not have IEPs.  Students may receive IEP services in the classroom (push in) or outside the classroom (pull-out). An inclusion classroom may have just a general education teacher with IEP services provided in a push in or pull-out model or it may have both a general education teacher and a special educator.  The term "inclusion classroom" is not defined in IDEA or its regulations nor in Rhode Island state law or regulations.

29.    Providence's IEP form provides that for general education placements as well as a spectrum of self-contained placements for students with disabilities.  It does not list an inclusion class that includes both a special educator and a general educator full-time in the classroom as a specific placement.

30.    As ABL aged, additional disabilities caused by his in-utero stroke were identified, and

---

[2] Although HBS charged tuition, it was a public entity under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(1), as it was part of a state institution of higher education, the Rhode Island College.

some additional educational services were provided in his IEP.

31.     He was identified as having a hearing impairment in his left ear when he was in kindergarten.  As a result, a Teacher of the Deaf is included in his IEP Team.

32.      In or around September 2016, he was evaluated for Adaptive Physical Education at his Parents' request, and the report recommended that he receive Adaptive Physical Education.

33.     On November 16, 2017, Donna L. Gavin, O.D. conducted a functional vision evaluation. The testing indicated convergence insufficiency, oculomotor difficulties, poor tracking, reduced stereopsis, poor visual memory, and difficulties with bilateral integration.  After the IEP Team reviewed the report, a Teacher for the Visually Impaired was added to the IEP Team on a consultative basis.  Because ABL had now been diagnosed with two sensory impairments, hearing and vision, ABL began being followed by Terri LaPlante, M.Ed., an Educational Consultant for the RI Services for Students with Dual Sensory Impairments (DSI Project) at the Paul V. Sherlock Center on Disabilities.

34.     His IEP for the period May 18, 2018, to May 17, 2019 provided the following services 4 weeks per month:   special education .5 hours a week, 2 days a week, APE .5 hours/day, 1 day/week, OT .5 hours/day, 2 days/ week, and PT .5 hours/day 1 day/week.  It also provided for OT consultation on average 15 minutes per month, vision consultation up to 30 minutes quarterly, and a Teacher of the Deaf at the start each trimester and as requested during the school year.

**ABL's Second Grade Year (2018-2019)**

35.     ABL's parents first suspected ABL had a math disability in second grade.  AB had a number of conversations about his difficulties with math with his classroom teacher and the Providence special educator who was working with him on writing, Erin Fahey.

36.      Parents became aware that accessibility of software/academic programs was important for

7

ABL.  They observed that the academic software, Xtramath, IXL, RazKids, and Seesaw on Kindles, used by the class was difficult if not impossible for ABL to use independently due to issues with motor control, visual load, and executive functioning challenges.

37.    During second grade, ABL asked to go to the nurse frequently.  He complained that he had headaches and that the work was too hard.

38.    He had been behind a little in first grade, but Parents had thought that was related to his difficulties in writing due to his physical disabilities. But he did not retain much of the math he learned in first grade when he got to second grade. His classroom teacher recommended that Providence be asked to provide additional resource support for him in math.

39.    The IEP Team met and requested HBS collect data on ABL's performance in math for eight weeks. HBS did the eight-week review.

40.    ABL had difficulties in learning to tell time.

41.     ABL did not have the manual dexterity to use an online math program without his parents typing and clicking for him.

42.    In November and December 2018, ABL's OT, Rebecca Klockars, conducted an OT evaluation of ABL that included both home and classroom observations.  The report noted that ABL "has difficulty maintaining postural control throughout the day and fatigues easily." He has "decreased organization, motor coordination, visual closure and vestibular processing skills which impact his ability to fulfill daily duties related to being a student."   She recommended both direct OT services and consultation that includes regular meeting with staff to assess progress. To date, Providence has not done any subsequent OT assessment.

43.    In November and December 2018, Jennifer Martinous, OTR/L, ATP, AT Consultant for TechACCESS of Rhode Island conducted an assistive technology (AT) assessment on behalf of

Providence. Martinous provided extensive recommendations and recommended his IEP team develop an implementation and formal AT Plan. The AT Plan should include a contact person for technical support, what to do when the technology is not working properly, and planning for training to enhance ABL's competence in using technology, and consideration of additional training and AT as ABL obtains his goals or his needs change.    ABL requires AT because of his decreased handwriting and legibility and because he primarily uses one hand. She also recommended training for staff and the student because software has lots of different features.

44.    The AT report noted that the class used software programs Xtramath, IXL, Raz Kids, and Seesaw, but that ABL could not use them independently and required a staff member to sit with him and assist him.  It also noted that the Providence special educator reported that ABL's math skills had been a concern of his teacher.

45.    Martinous recommended that the appropriateness of hardware and software be reviewed at least annually because students and their skills change as well as their environment and classroom demand.

46.    The recommendation for annual reviews has not been followed; Providence has never requested another AT assessment for ABL.

47.    An IEP meeting was held on December 14, 2018.  The minute notes stated that ABL "wants to please but when it is not his best he shuts down."  PT was discontinued.  The minutes reported that left hand coordination is difficult for ABL.  The HBS interventionist attended the meeting and the HBS math data was reviewed.  The minutes note that fact fluency under 10 was an issue and that his effort was inconsistent when given flash cards. Math was not added to ABL's IEP, and Providence did not initiate an evaluation for a math disability.

48.    ABL's second grade report card showed that he still needed support for addition and

subtraction within 20 and solving addition and subtraction problems within 100. In contrast, he was independent in reading, science, and social studies.

### ABL's Third Grade Year (2019-2020)

49.    An IEP meeting was held on December 14, 2019, and generated an IEP with effective dates January 9, 2019, to January 9, 2020.  It provided for special education in written language .5 hours/day, 2 days a week, 4 weeks a month, APE .5 hours/day, 1 day/week, 1 week a month, and OT .5 hours/day, 2 days per week, 4 weeks/month. It also provided for OT consult an average of 15 minutes per month, vision consult up to 30 minutes quarterly, and a Teacher of the Deaf/HH at the start of each trimester and, as requested, throughout the school year.

50.    Although ABL had continued to struggle with math, Providence did not initiate an evaluation in math or response to intervention (RTI) in math or add math to his IEP at any time during ABL's third grade year.

51.    Instead of Providence doing RTI or an evaluation, HBS did an eight-week intervention in math with ABL.  ABL worked with his classroom teacher and with the HBS interventionist.  ABL has scored in the 17th percentile on the January 30, 2020, STARR testing.  The summary indicated that he required support on all four topics, and that ABL had not completed single digit division successfully "even with multiple lessons, support and access to multiplication chart . . ."

52.    HBS did use a few different online math problems, including Xtramath and Zearn Math. Every program was a struggle for ABL because of his other disabilities.

53.    In January 2020, concerned about ABL's continued lack of progress in math, his parents hired a tutor.

54.    Even before the pandemic, Parents thought that the program at HBS, with general education and push-in and pull-out support, was not meeting his educational needs.

55.     As of March 16, 2020, schools were closed because of the Covid-19 pandemic and students, including ABL, were transitioned to distance learning, both for general education and for his special education and related services.

56.     ABL's parents saw that his needs were not being met it by the distance learning.   ABL required complete adult support to participate in distance learning.   They decided to transition him to homeschooling in the short-term during the pandemic with special education support being provided by Providence.

57.     On June 8, 2020, an IEP meeting was held.   The minutes reflect that the parents had decided to homeschool the student and that the student would be able to receive special education via walk in services at Leviton. Parents decided to retain all of ABL's IEP services.   When school began in Fall 2020, walk-in services were not provided because of Covid-19 protocols.

58.     The IEP minutes reflect that the "Parents brought up math issues." The school team determined not to add math to ABL's IEP and also did not offer to do any math assessments by Providence at that time.   The minutes reflect that "parents were advised to bring results [of Keymath evaluation] to Leviton team and Keymath evaluation and in conjunction with Henry Barnard school math information would be reviewed by Leviton team."   The minutes stated, "KeyMath is acceptable as evaluation for service in Math." No mention was made of RTI or the need for Providence to do its own evaluation.

59.     From March 15, 2020 to the end of the 2019-2020 school year, ABL did not get any APE, he got one OT session, a video for him to do on his own, and he got some resource support for writing via distance learning.

60.     On June 22, 2020, Educational Testing in math was conducted by Dr. Rachel Baldwin at Parents' expense using the KeyMath Diagnostic Assessment, Third Edition (KeyMath-3). Dr.

Baldwin's diagnostic impression was Specific Learning Disorder with Impairment in Mathematics (Dyscalculia).

61.     In her report, Dr. Baldwin noted, "In designing an educational plan to address ABL's learning disability in math, it is necessary to design interventions that are also responsive to other factors that interfere with his learning. More specifically, his challenges with working memory, regulation of attention, fatigue, visual and auditory impairments, and motor weaknesses all interfere with his learning and expression of skills and need to be accommodated in conjunction with a specific special education curriculum in mathematics."

**ABL's Fourth Grade Year (2020-2021)**

62.     A.B. notified the district that she had received the final neuropsychological report on August. 7, 2020.  She was advised that the district would not be able to meet until school returned.

63.     In August 2020, AB spoke with Thomas Mahoney, Special Education Specialist via phone about results of the Educational Testing and requested Providence identify an appropriate placement for ABL.  She followed up the phone call with an email requesting an IEP meeting to discuss both adding math support to the IEP and discussing an appropriate placement for ABL.

64.     In an email dated September 29, 2020, Mahoney advised that the services available through Reservoir Elementary "do not appear ready to meet ABL's needs."

65.     On October 9, 2020, an IEP meeting was held to review Dr. Baldwin's report. along with the HBS data.  The school team did not agree to add math to the IEP.  Kellie Girard advised that Providence could not add math without doing its own assessment.  No explanation was provided why Providence had not offered to do its own math assessment in the first instance rather than having HBS gather data or have the Parents do their own math assessment with Dr. Baldwin.

66.     Providence did not have a placement to offer as requested by the Parents.

67.     When the IEP team reconvened on December 4, 2020, ABL had still not received any IEP services at all during the 2020-2021 school year.  and Providence had failed to conduct the eight-week math intervention.   ABL's special education teacher, Alisha Mooney, explained that Covid-19 restrictions and internet access problems were reasons why ABL had not received math services.

68.     Mooney's first meeting with ABL was on Dec. 7, 2020.  ABL began meeting with her Google classroom. She provided Parents with a weekly meeting schedule that outlined which days she would be working with him on math and writing: Tuesday/Wednesday/Thursday for Math from 11:35-12:00 and Monday/Friday for writing from 11:35-12:00.  Because her schedule was tight, she would be meeting with him for writing during a reading group for younger children.

69.     On or around January 8, 2021, the IEP Team convened. Dr. Baldwin attended at Parent's expense to discuss her report. The team reviewed current levels but did not finish a draft IEP. District staff indicated that they would be recommending a fourth-grade inclusion classroom but did not identify a specific school.

70.     On January 11, 2021, the IEP Team again convened. The team reviewed goals for writing and math but did not finish the draft or offer a placement. Parents requested a draft of the IEP before the next meeting on January 15, 2021.

71.     On January 11, 2021, Parents notified Providence in writing of their intent to place ABL at the Wolf School unilaterally at public expense. They noted that, before the pandemic, they had been concerned that the combination of a general education program and special education and related services provided by Providence was inadequate to enable ABL to make meaningful educational progress.  They mentioned that they had requested an appropriate placement from the district in August 2020 and that ABL had not received any OT or APE since the onset of the

pandemic in March 2020.  They mentioned that ABL was owed compensatory services and that he often suffers from fatigue due to his disability, so that additional services before or after the school day are not appropriate for him.  They explained that they identified Wolf as an appropriate school "because it provides a true immersion program where the therapeutic supports ABL requires are integrated within the entire curriculum throughout the day in each classroom, removing numerous barriers to make it possible for him to access his education."  *Id.*

72.     Parents had explored other non-public schools, but there were no other schools that had the embedded OT supports that they thought were critical for ABL.

73.     Despite having written the ten-day letter, Parents continued meeting with Providence to prepare an IEP and they did not place AB at Wolf at that time.

74.     On January 15, 2021, the IEP Team convened to review and revise the IEP.  Mooney presented the OT goal; no OT was present. The minutes reflect: "When an OT meets with [ABL], this may need to be updated."

75.     On January 21, 2022, the IEP Team convened again.   Girard asked if the parents felt that the OT services in the past were meeting ABL's needs, and AB said the pull-out services were not enough.  She said that ABL's limited use of one hand hinders his ability to use the keyboard. She also mentioned his struggles with executive functioning.

76.     Parents requested the opportunity to visit the proposed placement with Dr. Baldwin, but Providence denied them that opportunity at that time.

77.     On January 21, 2021, Parents received an updated IEP. The IEP did not have a self-advocacy goal.

78.     The Parents did not agree to the proposed IEP and instead ABL continued to be homeschooled, with Providence providing special education services in math as well as writing.

14

Typically, the teacher wanted him to go on an app such as Freckle and work independently on math problems.    ABL could not work with the apps without 100 percent adult support from his parents.  Because the teacher was working with other children on reading on the zoom, ABL, who has a hearing disability, found the auditory input distracting.

79.    AB's mother explained the difficulties with using Freckle to the teacher, but the teacher continued using Freckle. AB reached out to Kellie Girard, the elementary manager for special education, about the difficulties that ABL had in accessing the math computer programs, and she referred AB to the principal at the Reservoir Avenue School. AB then reached out to the principal, Mrs. Torres.  The result was that the Freckle materials would be printed out.  Although ABL had a visual disability that affected his ability to read and required accommodations, there was no effort to make the pages accessible to ABL or to provide direct instruction from a special education teacher instead of using a computer program.

80.    ABL's problems with the computer programs were related to his physical, visual, and hearing disabilities.  He had only one hand to try to manipulate the mouse and type.  He also found the visual clutter difficult.

81.    Providence did not provide an AT assessment to address concerns that computer programs were inaccessible because of ABL's multiple disabilities.  Providence did not consult with anyone with expertise in accessibility for computer programs to determine whether the computer programs could be made accessible, such as by providing for macros.  Providence did not supply ABL with a one-handed keyboard.  Providence also did not provide alternative instruction, such as verbal mediation by the teacher.

82.    ABL's last progress report for the 2020-2021 academic year was dated April 28, 2021. Regarding his ELA goal, the report stated that "resource distant learning has created barriers that

inhibit his full potential."  For math, it sates "[t]here is insufficient data to show how much progress [ABL] has made due to barriers in a Virtual Resource setting."

83.     No OT attended any IEP meetings from October 2020 through January 2020.  AB testified that the absence of an OT was concerning because "OT in many ways is his most pressing need. It's the thing that gets in the way of him being able to learn and make it through the day."

84.     In April and May 2021, Dr. Baldwin re-evaluated ABL. Her diagnostic impressions were Left Hemiplegia, Attention-Deficit/Hyperactivity Disorder (Predominantly Inattentive Type), Developmental Coordination Disorder (including Dysgraphia), and Specific Learning Disorder with Impairment in Mathematics (Dyscalculia). In the report, she stated, "ABL is a complex child with intricate interplays between remarkable capabilities and significant constraints on his ability to engage the world."

85.     Dr. Baldwin's report also noted: "one of the challenges in working with various specialists is that this leads to a siloing of each area of challenge when his day-to-day experience is better understood and supported by understanding the additive and interactive aspects of his presentations. Often, standard interventions designed to address one area of weakness require him to rely on a domain that also represents an area of challenge for him. In addition, singular focus on addressing areas of weakness is likely to be disheartening and exhausting for ABL and would be a disservice" to his development.

86.     Dr. Baldwin provided an extensive list of updated recommendations, accommodations, and modifications for ABL, including a small class size that supports his strengths in verbal knowledge and reasoning skills:  a very low educator-to-student ratio; an OT as part of his daily classroom, one-to-one academic support in math.

87.     For the 2020-2021 academic year, ABL did not get any adaptive physical education and he

did not start receiving OT until April 15th.  He did not receive any math or writing support until the second week of December 2020.  Even after services began being provided, some dates services were canceled.

88.     The IEP for 2020-2021 was never amended to add special education in math.

89.     During the summer of 2021, Parents provided ABL with math tutoring from RITES.

### ABL's Fifth Grade Year

90.     By email, on August 10, 2021, parents notified Providence that they declined placement at Young Woods and confirmed ABL would attend Wolf for the 2021-2022 school year pursuant to the notice of unilateral placement that they had previously provided.  Again, Providence did not make any changes in the proposed IEP or offer to do any additional evaluations in response to the 10-day letter.

91.     ABL began attending Wolf in September 2021. Wolf is a school for complex learners, students who may have more than one challenge or learning disability.  ABL is considered a complex learner.

92.     Wolf has been transformative for ABL; his headaches and stomachaches have gone away, and he is happy to go to school, he is making progress in math, and he is developing a toolbox of tools for self-advocacy.   His energy and fatigue are better.  He is making academic progress in his weakest areas, including math.  He has blossomed because he has come to the reality that he does have disabilities and he is working on self-advocacy instead of avoiding acknowledging his struggles.  He has many opportunities outside of school to interact with nondisabled children.

93.     The Wolf immersion model embeds speech and OT in every classroom so there is a dedicated ST and an OT assigned to every classroom to provide support throughout the day.  His OT is in the classroom for two and a half full days (full days on Monday and Tuesday, half day on

Thursday)., and on the fourth day she is in the classroom just for the Spot-on Block of thirty minutes.

94.     Because ABL does not have functional use of his left hand, the OT at Wolf introduced him to a smaller keyboard that is easier and more efficient for one-handed typing.  She also used a typing program that has a model of using one hand.  He uses his left hand mostly as a helper hand, using the shift key or maybe one other key.

95.     The Wolf program provides him with the individualized services that he requires and the program is able to provide him with the accommodations and modifications that he requires for his disabilities.  Having daily access to OT services and math special education that takes account of his multiple disabilities and does not rely on inaccessible computer programs has enabled ABL to make appropriate educational progress.

### The Due Process Proceeding

96.     Parents filed their due process hearing request on January 18, 2022 with the Rhode Island Department of Education, pursuant to 20 U.S.C. § 1415 (Case #LL-22-01).  The case was assigned to IHO Frederic Tobin.  The Due Process Complaint included five claims:

    a.  The First Claim was that the IEPS in effect for 2019-2020, 2020-2021, and 2021-2022 were not reasonably calculated to provide Atlas with FAPE.

    b.  The Second Claim was that AB was denied FAPE during the Covid-19 Pandemic.

    c.  The Third Claim was that Providence violated its Child Find Obligations and denied AB was denied appropriate evaluations in Math and denied him FAPE by not providing special education in math.

    d.  The Fourth Claim was that the Providence violated ABL's rights under Section 504 by providing technology that was not accessible for him.

e.  The Fifth Claim was that Providence violated ABL's rights under the ADA by providing technology that was not accessible for him.

97.   After the parents filed their due process hearing request, Providence retained Dr. Dana Osowiecki, a neuropsychologist, to serve as an expert witness in this case.

98.   Parents objected to Providence performing an evaluation at this time.

99.   Dr. Osowiecki conducted her evaluation in March and April 2022. The hearing was delayed so that she could do her evaluation and complete her report before the hearing began.

100.   The hearing was held over eight days:  April 28, May 2, May 3, May 18, May 24, June 29, July 6, and July 12.

101.   Plaintiffs contended that bar Dr. Osowiecki's report and testimony was not relevant because  the evaluation was not available to Parents when they made their decision to unilaterally place AB at Wolf and was therefore not relevant under the snapshot rule adopted by the First Circuit. *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990).

102.   The parties submitted their post-hearing briefs on August 15, 2022 and their replies on August 22, 2022.

103.   Parents identified the issues presented as:

a.  Whether Providence violated its Child Find obligation to provide ABL with special education services in all areas of need by not providing math special education until January 2021.

b.  Whether Providence provided FAPE in math from December 2020-June 2021.

c.  Whether Providence's IEP for 2021-2022 was reasonably calculated to provide ABL with FAPE?

d.  If not, was the parent's unilateral placement appropriate.

e.   Whether the equities favor the placement;

f.   Whether ABL is entitled to compensatory education for the period March 16, 2020-
     June 30, 2021, and, if so, what compensatory education should be provided.

g.   Whether Providence violated ABL's rights to equal access to education under
     Section 504 and the ADA by providing him with computer programs for math
     instruction that he found inaccessible because of his other disabilities.

104.   The hearing officer issued his decision via email on September 20, 2022. A true copy of
the decision, with the names of the student and parents redacted, is attached as Exhibit A.

105.   ABL and his Parents are aggrieved by the hearing officer's decision.  The hearing officer
erred in many ways, including but not limited to:

a.   Failing to address Plaintiffs' claim that Providence failed to identify ABL's need
     for math special education and failed to provide appropriate math special education
     during the period January 18, 2020 through June 30, 2021 when ABL received
     special education services from Providence via a Providence IEP.

b.   Holding that ABL's parents "never gave Providence a chance to provide FAPE to
     ABL" and that Parents "have not diligently pursued the provision of appropriate
     services from the Providence Public Schools."  The hearing officer ignored the fact
     that ABL had received special education services from Providence via a Providence
     IEP since the very first day he was eligible and had experience with inaccessible
     computer programs used by Providence both in distance education and in in-person
     education at Young Woods. The hearing officer said nothing about the inaccessible
     math computer programs and the inadequate occupational therapy services on the
     IEP.  Further, IDEA does not require that parents try a public school placement

20

before obtaining reimbursement for a unilateral placement.

c.  Concluding the general education program at Young Woods could meet ABL's educational needs and that Wolf was not an appropriate unilateral placement for ABL.

d.  Holding that ABL's parents "impliedly rejected the compensatory services which had been offered in the IEP" when they rejected the Young Woods placement. ABL's claim for compensatory education is completely independent of his claim for educational placement in 2021-2022 or in subsequent years. ABL is entitled to compensatory education to compensate for Providence's failure to provide IEP services whether he attends Providence Public Schools or a private school or moves out of state. The IHO did not address Plaintiffs' claim that the compensatory services provided in the IEP were not sufficient and not appropriate.

e.  Failing to address Plaintiffs' claim that the math computer programs provided by Providence were inaccessible to ABL because of his other disabilities and therefore violated ABL's rights to equal opportunity and to equal access under Section 504 and the ADA.

### First Cause of Action

### Child Find and Denial of FAPE for Math Learning Disability

106.    As of January 18, 2020, two years before the due process complaint was filed, Providence had sufficient information to identify ABL as a student with a learning disability in math and/or determine that because of his previously identified disabilities that he had a need for special education in math and denied ABL FAPE by not including special education services in math in his IEP was in effect as of January 18, 2020 (the IEP dated Jan. 13, 2020 through Jan. 12, 2021,

known as the 2020-2021 IEP).

107.    Even when Providence began to provide math special education, it did not provide FAPE. Providence relied heavily on computerized math special education programs that were not accessible to ABL because of his other disabilities.  He had use of only one hand, which impairs his ability to access computers, yet Providence did not supply him with a one-handed keyboard or provide him with an assistive technology assessment nor did Providence provide any macros or other shortcuts or other adaptions that would enable ABL to have equal access to the computer program.  Providence supplied print outs of the computer program, but the printouts were not modified to address ABL's need for accommodations and modifications due to his visual impairment.  Providence does not ensure that all computer programs utilized for education have captions so that they are accessible for students like ABL who have hearing disabilities. Providence did not provide ABL with the direct instruction from a teacher that would enable him to benefit from education.

108.    The Providence special educator spent little time directly providing ABL with instruction and instead told him to work independently on the computer programs, with the sound muted during the zoom so as to minimize auditory distraction when she was teaching other students.

109.    Although the IEP for January 25, 2021 to January 24, 2022 provided for five hours of math special education, ABL received nowhere near five hours of math special education a week.  ABL did not make adequate progress in math because the math special education provided was not sufficient and also was not individualized to address ABL's multiple disabilities.

### Second Cause of Action

### Compensatory Education for Lost Education During the COVID Pandemic

110.    It is undisputed that ABL did not receive many of the services identified in his IEP during

the period March 16, 2020, through June 30, 2021 before his parents unilaterally placed him at Wolf.

111.    Providence included some limited compensatory services in its IEP but never offered any compensatory services that could be provided to ABL during the period January 25, 2022, through June 30, 2022, while he was being home schooled and had a flexible schedule nor has Providence offered any compensatory education services that could be provided following his unilateral placement at Wolf.

112.    The quantity of special education services offered by Providence was inadequate. Providence never explained to Parents how compensatory education was calculated but it appears to have been calculated based on services missed from September 2020 to December 2020 and does not include services missed from March 2020 to June 2020, when the pandemic initially closed in-person education or from January to June 2021.

113.    Because compensatory education is in addition to services required by a child's IEP, it should not supplant the regularly scheduled education services that the student would normally receive. Thus, compensatory educational services may be provided during an extended school day or during the summer or school breaks.

114.    ABL's parents explained that because ABL's disabilities cause him fatigue during school days, it is not appropriate for him to receive compensatory education during his regular school day or even during an extended school day. They have explained that an alternative plan for delivering compensatory education, such as using summer or other vacation time, needs to be developed for ABL.

115.    The hearing officer in his decision did not address the amount of compensatory education offered by Providence nor Parents' claim that compensatory education would need to be provided

during summer or vacation time so that it did not supplant education provided by the IEP or cause ABL fatigue.

116.    The hearing officer held that "When the parents rejected the Woods Young placement, they also impliedly rejected the compensatory services which had been offered in the IEP." But ABL's claim for compensatory education is completely independent of his claim for educational placement in 2021-2022 or in subsequent years.

117.    Students who move to other school districts and ever other states retain the right to compensatory education services for the period of the educational deprivation.   There is no requirement that compensatory education be delivered by school district staff during regular school hours.

118.    The hearing officer erred in denying Plaintiffs compensatory education services to compensate ABL for the deprivation of FAPE.

### Third Cause of Action

### Tuition Reimbursement for Unilateral Placement for the 2021-2022 school year

119.    The IEP proposed in January 2021 was not reasonably calculated to provide ABL with FAPE.  It did not provide him with the special education in math that he required.  The program at Young Woods used math computer programs, but there was nothing in the IEP that addressed the accessibility of computer programs.  Providence had not done an AT assessment for ABL since November 2018.  The IEP did not provide for the use of a one-handed keyboard even though Providence long knew that ABL did not have use of one hand.  The IEP did not provide for selecting computer software that ABL could access independently.  The IEP did not require captions on computer software and videos to address ABL's hearing impairment.  The IEP did not provide for verbal mediation for ABL to learn math.

120.    The IEP did not provide ABL with the intensive, immersive occupational therapy services that he requires.    Providence had not done an OT assessment of ABL since December 14, 2018. Based on that report, the OT services were provided in the 2018-2019 IEP for .5 hours a day, 2 hours a week, 4 weeks per month (4 hours of direct occupational therapy over four weeks), with consultation required on average 15 minutes per month.  Although there had not been a new OT assessment of ABL indicating that his needs for OT had changed, the IEP for 2019-2020 provided that as of fall 2020, his OT would be reduced to .5 hours of occupational therapy once a week for three weeks a month (1.5 hours of direct OT over four weeks) and no minimum time was provided for consultation; instead, consultation was designated "as indicated by staff or therapist" for the purpose of "train[ing] other staff members to implement specific activities in the classroom setting."

121.    In Providence, staff schedules are created based on the identified needs of students as reflected in their IEPs.  Providence therefore must identify a specific OT to provide the specific time required by the IEP.  When there is no specific time identified in the IEP, no specific time can be provided in an OT's schedule for providing the OT service.  Providence never provided Parents with a cogent reason for reducing the direct OT time from four hours to 1.5 hours for a four-week period or for reducing the consultation time from 15 minutes a month to "as indicated by staff or therapist."   Because the IEP provided inadequate OT services for ABL, it was not reasonably calculated for him to make educational progress.

122.    The IEP placement of a general education classroom with limited special education services was not appropriate for ABL.  The IEP did not specify that the student would be served in a co-teaching program or that staff would include anyone other than a general education and, for the time provided by the IEP, a special educator, and related services providers.  Because co-

teaching is not specified on the EP, Providence has the flexibility to provide a general education classroom without a special educator as a placement for ABL as long as the minutes of special education and related provided in the IEP are provided.

123.   Wolf is a proper unilateral placement for Wolf under IDEA as it provides ABL with the special education services that were missing from the IEP and the placement proposed by the school district, including intensive occupational therapy services and special education in math that relies on verbal mediation and not on inaccessible computer programs.

124.   Parents timely notified Providence of their intent to place ABL at Wolf as a unilateral placement.  They collaborated with Providence and attended multiple IEP meetings after their initial ten-day letter. They went with their son's neuropsychologist to observe the proposed program at Young Woods Elementary School.

125.   Providence did not offer to make any change in the IEP in response to the ten-day letter.

126.   Providence did not offer to do any new evaluations in response to the ten-day letter.

127.   Providence waited until after Parents filed for due process to obtain its own neuropsychological evaluation.

128.   Providence's IEP team never considered Dr. Osowiecki's evaluation in preparing an IEP.

129.   There are no equitable considerations that bar tuition reimbursement.

**Fourth Cause of Action**

**Section 504**

130.   ABL is a qualified individual with a disability protected from discrimination based on disability by Section 504 of the Rehabilitation Act of 1973.

131.   Providence receives federal funds, and, therefore, is subject to the requirements of Section 504 of the Rehabilitation Act of 1973.

132.   ABL is entitled to equal opportunity to benefit from education and to reasonable accommodations for his disabilities.

133.   Providence refused to provide him with the accommodations and modifications necessary for him to access the curriculum.  Providence denied him equal opportunity by failing to provide appropriate special education services in math that were designed for all of ABL's disabilities.

134.   Providence did not require that all software provided be accessible for his sensory (visual and hearing) disabilities as well as his physical disabilities.

135.   Providence did not train its teachers in providing accommodations and modifications in technology such as apps and distance learning.

136.   Providence acted intentionally and/or with deliberate indifference in providing technology to ABL, including apps and computer programs, that was not accessible to him, given his disabilities, including his physical disabilities (one-handedness), occupational therapy needs, visual and hearing disabilities and in failing to provide him with an AT plan and with an AT assessment to assist him in accessing computer programs.

137.   Providence acted intentionally and/or with deliberate in difference in failing to use verbal mediation as its primary mode of instruction in math for ABL.

138.   Providence acted intentionally and/or with deliberate indifference in not requiring that all computer programs have captions so that they are accessible to students with hearing impairments.

**Fifth Cause of Action**

**ADA**

139.   ABL is a qualified individual with a disability protected from discrimination based on disability by the ADA.

140.   Providence is a public entity and, is subject to the requirements of Title II of the ADA;

141.   ABL is entitled to equal opportunity to benefit from education and to reasonable accommodations for his disabilities.

142.   Providence refused to provide him with the accommodations and modifications necessary for him to access the curriculum in math.  Providence denied him equal opportunity by failing to provide appropriate special education services in math that was designed for all of ABL's disabilities.

143.   Providence did not require that all software provided be accessible for his sensory (visual and hearing) disabilities as well as his physical disabilities.

144.   Providence did not train its teachers in providing accommodations and modifications in technology such as apps and distance learning.

145.   Providence acted intentionally and/or with deliberate indifference in providing technology to ABL, including apps and computer programs, that were not accessible to him, given his disabilities, including his physical disabilities (one-handedness), occupational therapy needs, visual and hearing disabilities, and in failing to provide him with an AT plan and an AT assessment to assist him in accessing computer programs.

146.   Providence acted intentionally and/or with deliberate in difference in failing to use verbal mediation as its primary mode of instruction in math for ABL.

147.   Providence acted intentionally and/or with deliberate indifference in not requiring that all computer programs have captions so that they are accessible to students with hearing impairments.

Wherefore, the plaintiffs request that the Court:

a.   Receive the records of the administrative proceeding and hear additional evidence as appropriate;

b.   Reverse all portions of the hearing officer's decision and order;

c.   Award ABL appropriate compensatory education (1) to compensate for the failure to provide appropriate math special education during the period January 18, 2020, through June 30, 2021 and (2) to compensate for the failure to provide special education and related services required by ABL's IEP during the period from March 2020 through June 30, 2021.

d.   Determine that the IEPs provided by Providence for the periods January 13, 2020-January 12, 2021 and for the period January 25, 2021-January 24, 2022 were not reasonably calculated to provide ABL with FAPE.

e.   Determine that Wolf was an appropriate unilateral placement, and award Plaintiffs tuition reimbursement for the period September 2021 to date.

f.   Order Providence to develop protocols for (1) ensuring that computer technology, apps, and programs are accessible to students with disabilities and (2) addressing complaints that students are not able to access computer technology, apps, and programs due to their disabilities, including providing AT assessments and providing consultation with individuals who have expertise in assessing accessibility of computer technology, apps, and programs.

g.   Award Plaintiffs any other damages or other relief available under applicable law, including reimbursement for other educational expenses as well as monetary damages available under Section 504 and ADA;

h.   Award the Plaintiffs their reasonable attorneys' fees and costs and expenses pursuant to 20 U.S.C. § 1415(i)(3), including such fees, costs, and expenses as were incurred at the administrative level and such fees, costs, and expenses

as may be necessitated by this action; and

i.  Grant such other and further relief as the Court deems just.

Dated: October 19, 2022

Respectfully submitted,

/s/ Ellen Marjorie Saideman
Ellen Marjorie Saideman, Esq.
Law Office of Ellen Saideman
7 Henry Drive
Barrington, RI  02806
401.258.7276
fax 401.709.0213
esaideman@yahoo.com

Counsel for Plaintiffs ABL, DL, and AB

**Certificate of Service**

I hereby certify that on October 19, 2022, I filed and served this document through the CM/ECF

system on the following:

Mary Ann Carroll, Esq.
macarroll@hellawri.com

The document electronically filed and served is available for viewing and/or downloading from the CM/ECF system.

/s/ Ellen Marjorie Saideman
Ellen Marjorie Saideman, Esq